1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA    .      Criminal No. 1:11cr162
                            .
     vs.                    .      Alexandria, Virginia
                            .      March 31, 2011
SEAN WILLIAM RAGLAND,       .      2:00 p.m.
                            .
          Defendant.        .
                            .
.  .  .  .  .  .  .  .  .  .  .
```

TRANSCRIPT OF PRE-INDICTMENT PLEA
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:            CHARLES F. CONNOLLY, AUSA
                               PAUL J. NATHANSON, AUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314

FOR THE DEFENDANT:             J. FREDERICK SINCLAIR, ESQ.
                               J. Frederick Sinclair, P.C.
                               100 North Pitt Street, Suite 200
                               Alexandria, VA 22314-3134
                                 and
                               FRITZ JOSEPH SCHELLER, ESQ.
                               111 North Orange Avenue
                               Orlando, FL 32801

PRETRIAL SERVICES OFFICER:     LEO R. PET

ALSO PRESENT:                  WILLIAM B. CUMMINGS, ESQ.

OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                               U.S. District Court, Fifth Floor
                               401 Courthouse Square
                               Alexandria, VA 22314
                               (703)299-8595

(Pages 1 - 45)


COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

P R O C E E D I N G S

(Defendant present.)

THE CLERK:  Criminal Case 11-162, United States of America v. Sean William Ragland.  Would counsel please note their appearances for the record.

MR. NATHANSON:  Good afternoon, Your Honor.  Paul Nathanson and Charles Connolly for the United States.

THE COURT:  Good afternoon.

MR. SINCLAIR:  Good afternoon, Your Honor.  Fred Sinclair and Mr. Fritz Scheller representing Sean Ragland.  If I may, Your Honor, I'd like to move the admission of Mr. Scheller to practice before this Court for the purposes of the plea and the sentencing pro hac vice.  I have filed a form with the government -- or he has -- showing our $50 has been paid, and he's in good standing, I would hope.

And I would like to just give you a quick background, Your Honor.  He's a 1999 graduate of Boalt Hall, Order of the Coif.  In 2000, he became an assistant federal public defender in the Middle District of Florida.  2002, he became a supervisor with that district.  He left the Federal Public Defender's Office in 2006, started his own private practice, majority is federal criminal.

He's also handled cases in federal courts in Pennsylvania, Your Honor; New York, the Western and Eastern District of New York; the Southern District of Florida as well, of

1    course, as the Middle District of Florida; and therefore, I'd like

2    to add the Eastern District to his resume.

3           THE COURT:  Very good.  I'll grant the motion, and the

4    paperwork has been signed, Mr Scheller.  Welcome on board.

5           MR. SCHELLER:  Thank you very much, Your Honor.

6           THE COURT:  You know, you need running shoes in this

7    courtroom.

8           MR. SCHELLER:  That's my understanding.

9           THE COURT:  Very good.  All right, my understanding is

10   this matter is coming on for a pre-indictment plea, correct?

11          MR. SINCLAIR:  It is, Your Honor.

12          THE COURT:  All right.  Then, Mr. Ragland, you need to

13   come up to the lectern with one of your counsel, whoever wants to

14   be the lead counsel on this case.

15              SEAN WILLIAM RAGLAND, DEFENDANT, AFFIRMED

16          THE COURT:  All right, Mr. Ragland, you have now taken a

17   promise to tell the truth in answering all of the Court's

18   questions.  If you should lie in answering any question, the

19   government could prosecute you for a new and separate crime called

20   perjury.  Do you understand that?

21          THE DEFENDANT:  I understand, Your Honor.

22          THE COURT:  For the record, what is your full name?

23          THE DEFENDANT:  Sean William Ragland.

24          THE COURT:  And how old, are you, Mr. Ragland?

25          THE DEFENDANT:  I'm 37 years old.

4

1          THE COURT:  How much education have you completed?

2          THE DEFENDANT:  I have a Bachelor of Science Degree from

3   the University of Central Florida.  I got a major in finance.

4          THE COURT:  And I assume, therefore, that you don't have

5   any problem reading, writing, understanding, or speaking English;

6   is that correct?

7          THE DEFENDANT:  No, I do not, Your Honor.

8          THE COURT:  All right.  Are you a United States citizen?

9          THE DEFENDANT:  Yes, I am.

10          THE COURT:  Are you presently on probation, parole, or

11   supervised release from any other case?

12          THE DEFENDANT:  No, I am not, Your Honor.

13          THE COURT:  Are you at this time being treated by a

14   doctor for any physical or mental condition?

15          THE DEFENDANT:  No, I am not, Your Honor.

16          THE COURT:  Within the last 24 hours, have you taken any

17   medication, whether over the counter or by prescription?

18          THE DEFENDANT:  No, I have not.

19          THE COURT:  Are you at this time under the influence of

20   any alcohol or drugs?

21          THE DEFENDANT:  No, I am not.

22          THE COURT:  All right, Mr. Ragland, we have several

23   documents we need to review this afternoon in relation to your

24   plea.  The first one has the title "Waiver of an Indictment," and

25   I see what appears to be your signature as well as that of your

1   counsel.  Now, do you recall signing the waiver of indictment?

2            THE DEFENDANT:  I do, Your Honor.

3            THE COURT:  Was that signed today?

4            THE DEFENDANT:  Yes, it was.

5            THE COURT:  All right.  I assume, however, that before

6   today, you discussed the waiver with counsel.  Did you do that?

7            THE DEFENDANT:  I did.

8            THE COURT:  And did your attorneys explain to you that

9   under the laws and Constitution of the United States, you have an

10  absolute right to require that the federal prosecutors go before a

11  group of people called a federal grand jury with the evidence

12  they've developed concerning your involvement in a conspiracy to

13  commit bank fraud and wire fraud?  Do you understand that?

14           THE DEFENDANT:  I do, Your Honor.

15           THE COURT:  Now, a federal grand jury is made up of

16  anywhere from 16 to 23 ordinary citizens who are brought together

17  on a random basis, and the purpose of the grand jury process in

18  our legal system is to basically make sure that before people are

19  publicly charged with serious criminal activity, that there's

20  really a factual basis to support such charge or charges, and so

21  what happens in the grand jury process, which is a secret process,

22  is a prosecutor goes before the grand jury, advises the grand jury

23  that he believes that a person may have committed certain federal

24  felony offenses, and then the prosecutor presents evidence to the

25  grand jury supporting that position.

1          The evidence could be the testimony of witnesses; it
2   could be photographs, charts, bank records, etc.; but whatever it
3   is, when the presentation, which could take a couple of minutes, a
4   couple of hours, or in some cases weeks or months, but at the end
5   of the presentation, if at least 12 members of that grand jury are
6   satisfied that the evidence establishes probable cause to believe
7   the person may have committed the offense or offenses, then the
8   grand jury issues a document called an indictment, and that is
9   normally how a felony-level prosecution begins in federal court.

10          Do you understand that?

11          THE DEFENDANT:  I do, Your Honor.

12          THE COURT:  So as I said, the grand jury is considered
13   to be a protection of an individual person's rights, because it's
14   there to make sure that people are not publicly charged when
15   there's no basis for the charge.  Do you understand that?

16          THE DEFENDANT:  I do.

17          THE COURT:  Now, a person can give up his right to that
18   review process, and that would be done by signing a waiver of
19   indictment.  The word "waiver" in the law basically means to give
20   something up, so by waiving indictment, you're giving up that
21   grand jury review process, and instead you're authorizing the
22   prosecutors to come to court today and file this conspiracy charge
23   against you using a document called a criminal information, and
24   that information will not have been tested by the grand jury.

25          Do you understand that?

1          THE DEFENDANT:  I do, Your Honor.

2          THE COURT:  And did you understand all of what I've just

3  gone over with you before you signed the waiver?  In other words,

4  did your counsel basically explain to you what I've just gone

5  over?

6          THE DEFENDANT:  Yes, they did, Your Honor.

7          THE COURT:  Now, other than the plea agreement, which

8  we'll discuss in a few minutes, has anybody promised or suggested

9  to you that by waiving indictment, you would get a lighter

10  sentence from the Court or more favorable treatment by the Court?

11          THE DEFENDANT:  No, they have not.

12          THE COURT:  Has anyone put any force or pressure on you

13  to waive indictment today?

14          THE DEFENDANT:  None, Your Honor.

15          THE COURT:  Mr. Sinclair, have you and cocounsel had

16  enough time to thoroughly go over this waiver with Mr. Ragland?

17          MR. SINCLAIR:  We have, Your Honor.

18          THE COURT:  Are you satisfied that Mr. Ragland has

19  entered the waiver in a knowing and voluntary fashion?

20          MR. SINCLAIR:  We are satisfied, Your Honor.

21          THE COURT:  All right.  Then, Mr. Ragland, at this

22  point, the Court accepts your waiver.  I'm satisfied that you've

23  entered the waiver in a knowing and voluntary fashion and that

24  you've had the full advice of counsel in connection with it, and

25  having accepted the waiver, that allows the United States to file

1   the following information against you, and I assume you've had a

2   copy of this criminal information?  Is that correct?

3          MR. SINCLAIR:  We do, Your Honor.

4          THE COURT:  All right.  So you know that it's alleged

5   that beginning in or about 2006 and continuing through on or about

6   August of 2009, you were a member with at least one other person

7   of a conspiracy, which is basically an agreement, to commit

8   several offenses against the United States, specifically, bank

9   fraud and wire fraud, and then it's alleged that in furtherance of

10  that conspiracy, on May 15, 2008, you sent by e-mail from the TBW

11  in Ocala, Florida, to a coconspirator in the Eastern District of

12  Virginia and to investors and other third parties an Ocala Funding

13  facility report that inflated the assets reportedly held in the

14  Ocala Funding by approximately $680 million.

15         Do you understand they'd have to prove -- that's the

16  case that's been charged against you.  Do you understand that?

17         THE DEFENDANT:  I understand, Your Honor.

18         THE COURT:  And to that conspiracy charge, how do you

19  want to plead, guilty or not guilty?

20         THE DEFENDANT:  I plead guilty, Your Honor.

21         THE COURT:  Now, Mr. Ragland, before the Court accepts

22  that guilty plea, I'm going to review the plea agreement and the

23  written statement of facts which is part of the plea agreement

24  with you, and at any point this afternoon if you should change

25  your mind and decide you don't want to plead guilty, you have an

1  absolute right to withdraw your guilty plea.

2          Do you understand?

3          THE DEFENDANT:  I understand, Your Honor.

4          THE COURT:  Now, the plea agreement that's been filed

5  this afternoon is 14 pages long, and I see on page 14 what appears

6  to be your signature and again today's date.  Did you, in fact,

7  sign the plea agreement?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And you signed it today here in the

10  courthouse; is that correct?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Now, before today, when did you first see

13  this plea agreement, approximately?

14          THE DEFENDANT:  Last Monday.

15          THE COURT:  All right.  And before last Monday, I assume

16  before then you had been talking with your attorneys about a

17  possible plea; is that accurate?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  Now, last Monday, did you get a

20  copy of the plea agreement to keep, or did you just look at it at

21  your attorney's office?

22          THE DEFENDANT:  I had an electronic copy that was sent

23  to me from my attorney.

24          THE COURT:  All right.  And, counsel, Mr. Sinclair, is

25  the plea agreement that's in court today the exact same agreement

1   that was e-mailed?

2           MR. SINCLAIR:  Your Honor, Mr. Scheller will address

3   that, because he's been doing the initial negotiations.  I came

4   into the case yesterday, but my understanding is that there was

5   some give and take between Mr. Scheller and the U.S. attorneys,

6   and then when I got on board, we also tweaked it a little further,

7   and so the final plea agreement was actually signed today with the

8   last couple changes, but they're minor changes having to do with

9   dates and some language in the statement of facts.

10          THE COURT:  Was it the statement of facts?  All right.

11          The main thing I want to know from you, Mr. Ragland, is

12  are you satisfied that you've read every word of the plea

13  agreement?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  All right.  That's the critical fact.  And

16  have you discussed this plea agreement thoroughly with your

17  counsel?

18          THE DEFENDANT:  Yes, I have, Your Honor.

19          THE COURT:  Have you asked them all the questions that

20  you have about the plea agreement?

21          THE DEFENDANT:  Yes, all the ones I can think of, Your

22  Honor.

23          THE COURT:  All right.  And have your attorneys answered

24  your questions to your satisfaction?

25          THE DEFENDANT:  Yes, they have.

1          THE COURT:  Are there any questions you want to ask me

2    about the plea agreement?

3          THE DEFENDANT:  No, Your Honor.

4          THE COURT:  All right.  Now, I want you to look at page

5    14.  I'm going to repeat a little bit of what we've just done, but

6    I want you to recognize that there's actually language in your

7    plea agreement that goes over this line of questioning.

8          Right above your signature are two sentences, and they

9    begin with the words "I have read."  Do you see that?  And they

10   go, "I have read this plea agreement and carefully reviewed every

11   part of it with my attorney.  I understand this agreement and

12   voluntarily agree to it."

13         Do you see those two sentences?

14         THE DEFENDANT:  Yes, I do, Your Honor.

15         THE COURT:  Are they completely true in every respect?

16         THE DEFENDANT:  Yes, they are.

17         THE COURT:  Mr. Ragland, by telling the Court that

18   you've read the entire plea agreement yourself and discussed it

19   thoroughly with counsel and by also admitting that you understand

20   the agreement and are voluntarily agreeing to it, that means

21   you'll be bound by everything that's written in this 14-page

22   document even if I don't go over every paragraph or page with you

23   in court today.

24         Do you understand that?

25         THE DEFENDANT:  I understand, Your Honor.

1          THE COURT:  And the reason for that result is that

2     really the plea agreement in court today is a written contract

3     between you and the United States government, and you know from

4     your background in finance that when a person signs a written

5     contract after carefully reviewing it and discussing it thoroughly

6     with counsel and he signs it voluntarily, then that's a binding

7     legal document, and you can't just come back to court in a couple

8     of weeks and say, "Well, I've thought more about it.  I don't like

9     page 5.  I want to change it."  That's too late.

10          Do you understand that?

11          THE DEFENDANT:  I understand that.

12          THE COURT:  Now, other than the written plea agreement

13     that's in court today, do you have any side deals or side

14     understandings with any prosecutor, whether federal or state, in

15     Virginia, Florida, Georgia, or anyplace else, or any

16     investigators, including bank examiners, bank officials, SEC

17     people, or anybody else concerning this case?

18          THE DEFENDANT:  No, I do not, Your Honor.

19          THE COURT:  Mr. Sinclair, is that correct?

20          MR. SINCLAIR:  That's correct, Your Honor.

21          THE COURT:  All right.  Then let's turn to page 1,

22     paragraph 1 of the plea agreement, and there it says that you have

23     agreed to waive indictment, which you have just done, and enter a

24     guilty plea to the criminal information I just summarized for you.

25          Now, do you understand that a conspiracy offense under

1   section 371 of Title 18, which is what you're charged with, is a

2   felony which exposes you to up to five years of imprisonment

3   followed by up to three years of supervised release?  In addition,

4   you could be required to pay a fine of either up to $250,000 or

5   alternatively a fine of not more than the greater of twice the

6   gross loss or gross gain.  Do you understand that?

7            THE DEFENDANT:  I understand, Your Honor.

8            THE COURT:  In addition, you could be required to make

9   full restitution to the victims of this case, and there will be an

10  automatic special assessment of $100 which must be imposed no

11  matter what your financial situation is.  Do you understand that?

12           THE DEFENDANT:  I understand that.

13           THE COURT:  Now, there is no possibility for parole in

14  the federal system.  That means whatever term of imprisonment is

15  imposed must be fully served.  Do you understand that?

16           THE DEFENDANT:  I understand that, Your Honor.

17           THE COURT:  And as soon as the prison portion of the

18  sentence has been served, then the supervised release portion

19  begins.  When a person is on supervised release, he's under the

20  control of a federal probation officer, and there may be special

21  requirements during the supervised period.

22           For example, in a financial crime, where there's often

23  restitution required, there may be limitations on a person's

24  financial activities, a requirement to waive any privacy rights to

25  financial records so the Probation Office can monitor that.  There

1   may be a set payment plan to make payments against the

2   restitution.   Those are examples of conditions of supervision.

3        I cannot tell you in your case all of the conditions,

4   because I haven't seen the presentence report.   The key fact that

5   you need to understand, however, is that if you were to violate

6   any condition of supervised release, you could be brought back to

7   the court, and if the violation were sustained, you could then be

8   punished by being sentenced to a period of imprisonment as long as

9   the period of supervised release, which is three years.

10       Do you understand that?

11       THE DEFENDANT:   I understand that, Your Honor.

12       THE COURT:   Now, when it comes time for sentencing, the

13  Court is going to have to look at many different factors.   First

14  we're going to look at the sentencing guidelines that may apply to

15  your case, and this is discussed in paragraph 6 of your plea

16  agreement, but first of all, I want to make sure you understand

17  how guideline sentencing works.

18       The Court basically has to make two factual decisions

19  before the guidelines can be calculated.   The first decision is a

20  person's criminal history.   Criminal histories are divided into

21  six categories, each getting a number.   A No. I history would go

22  to somebody who's never been in trouble with the law or who has a

23  very minor record, and then as convictions, probation violations,

24  and other problems occur, the score goes up, with a level VI going

25  to the most serious offenders.

1          Do you understand that?

2          THE DEFENDANT:  I understand that, Your Honor.

3          THE COURT:  And then the Court has to determine the

4  offense level.  Now, every federal crime has a number given to it

5  by the Sentencing Commission, and then depending upon the facts of

6  the specific case, that number can go up or down.

7          Now, in paragraph 6 of the plea agreement, and this is

8  on page 4, you and the government have agreed to certain factors

9  for guideline purposes.  For example, you've agreed that your

10 criminal history category would be a category I based on your

11 record and then that various guidelines in terms of the offense

12 level include the following:  that the offense level, the base or

13 bottom offense level would be a 6; that because there was a loss

14 of more than $400 million, there would be a 30-level increase;

15 because the charge that's involved in Count 1 of the criminal

16 information involved sophisticated means, that could result in a

17 two-level further increase; and those are factors that have

18 increased the offense level.

19         An offense level can be reduced if a defendant accepts

20 full responsibility for his criminal conduct.  In that case, he

21 can get a two-point reduction and in many cases a third point, and

22 the government has agreed in paragraph 6.d that if you qualify for

23 the two-point decrease, they will ask the Court to award you a

24 third level decrease.

25         The -- in paragraph 6.e, the maximum sentence that's

1  available in this case is five years, or 60 months, and what has

2  been provided for in 6.e is that if the statutorily authorized

3  maximum sentence, which again is 60 months in this case, is less

4  than the minimum of the applicable guideline range, the

5  statutorily maximum sentence shall be the guideline sentence.

6  That's what you-all have agreed to for purposes of the guidelines,

7  and then there are no other agreements as to the guidelines.

8          Now, do you understand all of what's in paragraph 6?

9          THE DEFENDANT:  I do, Your Honor.

10         THE COURT:  All right.  The most important fact you need

11  to understand is that although paragraph 6 is binding on the

12  prosecution and on you and your counsel, it -- in no way does it

13  limit the probation officer who's going to prepare the presentence

14  report, which will include a guideline calculation, or this Court.

15  Do you understand that?

16         THE DEFENDANT:  I understand that, Your Honor.

17         THE COURT:  So if the presentence report has different

18  numbers in it, that does not mean that the plea agreement's been

19  violated, and it would not give you a basis to withdraw your

20  guilty plea.  Do you understand that?

21         THE DEFENDANT:  I understand that, Your Honor.

22         THE COURT:  All right.  But at the sentencing hearing,

23  the Court will have the two numbers, the criminal history number

24  and the offense number, whatever they are, whatever we decide they

25  are, and those two numbers will be put on the guideline table

1    which will establish an advisory guideline range, which I suspect

2    in this case will be well above the 60-month maximum sentence in

3    this case.   The Court is limited by that maximum of 60 months.

4              Do you understand that?

5              THE DEFENDANT:   I do, Your Honor.

6              THE COURT:   All right.   In addition to the guidelines,

7    however, the Court must also consider many factors that are

8    spelled out in section 3553(a) of Title 18, so before any sentence

9    is imposed, the Court is going to look very carefully at your

10   entire background, your work history, your family history, any

11   medical issues in your past.   We're going to look very carefully

12   at exactly what you did in this conspiracy.

13             We have to take into consideration other persons --

14   several people have now pled guilty as part of this overall

15   conspiracy case -- so that the sentences are as appropriate as

16   possible reflecting the various levels of culpability of the

17   various people involved.   Do you understand that?

18             THE DEFENDANT:   I understand that, Your Honor.

19             THE COURT:   The Court must also consider the deterrent

20   effect of any sentence both as a way of deterring you from

21   committing similar criminal activity in the future and also for

22   sending a clear method to others in financial institutions to make

23   sure that they think twice about getting involved in such conduct.

24   Do you understand that?

25             THE DEFENDANT:   I understand, Your Honor.

1          THE COURT:  And so when all of that is looked at,

2   ultimately the Court will decide the sentence.

3          Now, I'm going to assume that you've discussed with your

4   counsel both the guidelines that may ultimately apply to your case

5   as well as the final sentence that you could be expecting.  Is

6   that a fair description of what you've done?

7          THE DEFENDANT:  That's correct, Your Honor.

8          THE COURT:  I want to make sure you understand that no

9   matter what your attorneys may have said to you in terms of what

10  they think you may get in terms of a sentence or, for that matter,

11  if the prosecutors, investigators, or anybody else have given you

12  estimates or suggestions about what sentence they think you may

13  get, none of those discussions in any respect limit or bind the

14  Probation Office or this Court.

15         Do you understand that?

16         THE DEFENDANT:  I do, Your Honor.

17         THE COURT:  And if at the sentencing hearing the Court

18  imposes a sentence on you that is different from what you are

19  expecting or hoping for, that will not give you a basis to

20  withdraw your guilty plea.  Do you understand that?

21         THE DEFENDANT:  I do, Your Honor.

22         THE COURT:  Now, normally a defendant in a criminal case

23  can appeal the sentence imposed on him, but if you look at

24  paragraph 5 of your plea agreement, and this is on page 3, in the

25  second sentence, it indicates that you are knowingly waiving the

1  right to appeal both your conviction for the conspiracy that's

2  charged in the information and any sentence as long as the

3  sentence is not greater than the statutory maximum.

4          That means as long as the Court does not sentence you to

5  more than 60 months of incarceration followed by three years of

6  supervised release and the fine is not greater than either of the

7  two fine mechanisms that are described in paragraph 1 of the plea

8  agreement and the special assessment is not greater than $100, you

9  cannot appeal that sentence for any reason.

10         Do you understand that?

11         THE DEFENDANT:  I do, Your Honor.

12         THE COURT:  Now, in exchange for your guilty plea, the

13  government has agreed, No. 1, in paragraph 10 of the plea

14  agreement that there will be no further prosecution for you -- of

15  you for the activities described in the information or the

16  statement of facts in this district and also the Middle District

17  of Florida.  So that's where -- is it Ocala or "Ocala"?  How do

18  you pronounce it?

19         MR. SCHELLER:  "Ocala."

20         THE COURT:  "Ocala"?  I'll know that by the end of the

21  next few weeks, I suppose.

22         But Ocala is in the Middle District of Florida, so the

23  activities that occurred there that U.S. attorney has also agreed

24  not to prosecute you for, but there were certainly activities

25  involved in the overall conspiracy in Georgia, for example, and

1   there may very well be other, other jurisdictions affected as

2   well, and what you need to understand is those U.S. attorneys have

3   not agreed to this agreement.

4           Do you understand that?

5           THE DEFENDANT:   I understand, Your Honor.

6           THE COURT:   So there's still potentially liability

7   there.

8           Now, I've said in all the other pleas I've taken in this

9   case that I don't agree with the position the government is taking

10  in paragraph 10 that only the Fraud Section of the Criminal

11  Division is barred from further prosecuting the defendant

12  criminally for activities related to this case.   I think at the

13  very least, one section of the Criminal Division binds the whole

14  Criminal Division, and I -- some day we'll have to litigate that,

15  I suppose, but I'm just letting you know that's what the

16  government says in this plea agreement.   I'm not sure that they

17  could, that they could justify another prosecution of you for

18  activities related to this case coming from another section of the

19  Criminal Division.   That's down the road.

20          But clearly, paragraph 10 does not give you universal

21  immunity.   That's the main thing I want you to understand.

22          THE DEFENDANT:   I do understand that, Your Honor.

23          THE COURT:   All right.   And, Mr. Sinclair, I'm sure as a

24  former prosecutor, you've explained all of that to him.

25          MR. SINCLAIR:   I have, Your Honor.

1          THE COURT:  All right, that's fine.

2          Now, you've agreed in paragraph 9 to a restitution

3   order.  That amount has not been specifically determined at this

4   point, but you understand that that could be a very significant

5   amount?

6          THE DEFENDANT:  Yes, I do, Your Honor.

7          THE COURT:  All right.  You have agreed in paragraph 11

8   to cooperate with the United States, and the cooperation is

9   described in subparagraphs a through f but includes among other

10  things your testifying truthfully and completely at any trials,

11  grand juries, or other proceedings; your being reasonably

12  available for debriefings and pretrial conferences; and your

13  agreeing to provide documents and any other evidence to the

14  government for its use in any criminal investigation.

15         Do you understand that?

16         THE DEFENDANT:  I do, Your Honor.

17         THE COURT:  In paragraph 12, the United States has

18  agreed that it will not use any truthful information that you

19  provide under paragraph 11 in any prosecution against you in the

20  Eastern District of Virginia, the Middle District of Florida, or

21  by the Fraud Section, and again, I'm not convinced that that would

22  necessarily limit -- is as limited as they say, but the essential

23  thing is you've got to be completely truthful.  If you leave

24  something out or it's anything dishonest, then you wouldn't get

25  the protections of paragraph 12.

1          Do you understand that?

2          THE DEFENDANT:  Yes, I do, Your Honor.

3          THE COURT:  All right.  Now, most defendants who

4   cooperate with the government do so with the hope that at the end

5   of the day, the cooperation will result in some benefit with the

6   sentence, and that can happen in one of two ways.  This is

7   addressed in paragraph 15 of your plea agreement, on page 9.

8          Either at the sentencing hearing itself or before

9   sentencing, the government could file a motion under 5K1.1 of the

10  guidelines, and that kind of a motion would ask the Court to

11  impose a sentence below the guideline range because of a

12  defendant's substantial cooperation.  Do you understand that?

13         THE DEFENDANT:  I do, Your Honor.

14         THE COURT:  The other way in which a sentence can be

15  affected by cooperation is if after the person has been sentenced,

16  so usually the person is now in prison serving the sentence, the

17  government files a Rule 35(b) motion, which would ask the Court to

18  reduce an already-imposed sentence.

19         Now, only the government can make one of those two

20  motions, and what you need to understand is that the government

21  has not promised you that it will file such a motion even if

22  you've cooperated.  Do you understand that?

23         THE DEFENDANT:  I do understand that, Your Honor.

24         THE COURT:  All right.  And so if they do not file such

25  a motion, that is not a violation of the plea agreement, and it

1  would not give you a basis to withdraw your guilty plea.  Do you

2  understand that?

3          THE DEFENDANT:  I understand, Your Honor.

4          THE COURT:  Moreover, paragraph 15 is not binding on the

5  Court, so let's say, for example, the government did file a Rule

6  35(b) motion and asked the Court to reduce your sentence by 60

7  percent and I felt for various reasons that only a 10 percent

8  reduction was appropriate and that was my decision.  That decision

9  would not violate the plea agreement, and it would not give you a

10 basis to withdraw your guilty plea.

11         Do you understand that?

12         THE DEFENDANT:  I do understand that, Your Honor.

13         THE COURT:  Now, paragraphs 16, 17, and 18 discuss

14 forfeiture.  Individuals who are involved in criminal activity and

15 who obtain any money or, or assets through that activity or who

16 use property, for example, they drive their car to some illicit

17 meeting, can give up their right to that property, and what

18 paragraphs 16 through 18, although they don't specifically

19 describe any actual property involved here, do put various

20 obligations on you about revealing property and agreeing not to

21 oppose forfeiture if the government seeks to forfeit it.

22         Do you understand that?

23         THE DEFENDANT:  I do understand that, Your Honor.

24         THE COURT:  All right.  Now, have you had enough time to

25 explain everything you know about this case with your attorneys?

1          THE DEFENDANT:  Yes, I have, Your Honor.

2          THE COURT:  And have they discussed the nature of this

3   conspiracy charge and any ways in which you could possibly defend

4   yourself against the charge with you?

5          THE DEFENDANT:  Yes, they have.

6          THE COURT:  Are you fully satisfied with the way your

7   counsel have represented you in this matter?

8          THE DEFENDANT:  I'm satisfied, Your Honor.

9          THE COURT:  And do you understand that you still have a

10  right at this time to plead not guilty and to go to trial on the

11  charge?

12         THE DEFENDANT:  I do, Your Honor.

13         THE COURT:  If you were to go to trial, then the burden

14  would be on the government to prove you guilty.  In order for that

15  to happen, they must prove your guilt beyond a reasonable doubt.

16  Do you understand that?

17         THE DEFENDANT:  I do, Your Honor.

18         THE COURT:  And specifically, they'd have to prove,

19  No. 1, that there was, in fact, a conspiracy as they've described

20  it in the information.  So they have to show that between 2006 and

21  August of 2009, there was an agreement between at least two people

22  to commit the crimes of bank fraud and wire fraud.  They then have

23  to prove that at least one act in furtherance of that conspiracy

24  occurred in the Eastern District of Virginia.

25         They then have to prove that you knowingly and

1   intentionally, and that means not by an accident or mistake or

2   some other innocent reason, joined into the activities of the

3   conspiracy.  You don't have to have done it from the very

4   beginning or been a member of the conspiracy to its very end, but

5   they've got to prove beyond a reasonable doubt that at some point

6   during that three-year time span, you knowingly and intentionally

7   engaged in the activities of the conspiracy.

8           Do you understand that?

9           THE DEFENDANT:  I do, Your Honor.

10          THE COURT:  And then lastly, they'd have to prove beyond

11  a reasonable doubt the overt act which they've alleged on page 3

12  of the information, which is that on or about May 15 of 2008, you

13  sent an e-mail from TBW in Ocala, Florida, to a coconspirator in

14  the Eastern District of Virginia as well as to others, and in that

15  you reported that inflated assets allegedly being held by the

16  Ocala Funding, they were inflated by about $680 million.

17          That's the specific overt act that they've alleged in

18  this case.  There could very well be other overt acts as well, but

19  that's the one they've alleged, and they'd have to prove beyond a

20  reasonable doubt to convict you.  Do you understand that?

21          THE DEFENDANT:  I understand, Your Honor.

22          THE COURT:  Now, if you pled not guilty, there are

23  various rights and protections a person has who goes to trial,

24  most of which are given up by pleading guilty.  At trial, you

25  could see all of the government's witnesses and evidence and test

1   it all through the questions of your counsel.  Do you understand

2   that?

3          THE DEFENDANT:  I do, Your Honor.

4          THE COURT:  You could ask the Court to issue subpoenas

5   that would require the presence at the courthouse of either

6   witnesses or physical evidence that you could use in your defense.

7   Do you understand that?

8          THE DEFENDANT:  I do, Your Honor.

9          THE COURT:  You could testify as a witness.  Do you

10  understand that?

11         THE DEFENDANT:  I do.

12         THE COURT:  However, you could also invoke your Fifth

13  Amendment right to remain silent, and if you chose not to testify,

14  no inference of guilt could be drawn from that decision.  Do you

15  understand that?

16         THE DEFENDANT:  I do, Your Honor.

17         THE COURT:  You would, of course, have the right to the

18  help of a lawyer at all stages of your trial, and if you could not

19  afford to hire counsel for yourself, we would make sure you had a

20  lawyer at taxpayers' expense.  Do you understand that?

21         THE DEFENDANT:  I do, Your Honor.

22         THE COURT:  Now, there are two different ways in which a

23  case can be tried.  You can have a trial by a jury, in which case

24  12 ordinary citizens are randomly brought to the courthouse to

25  decide the case, or you can have a trial by a judge sitting alone,

1  called a bench trial, but in either type of trial, whether to a

2  judge alone or to a jury, you could not be convicted unless the

3  government proved your guilt beyond a reasonable doubt.

4           Do you understand that?

5           THE DEFENDANT:  I do, Your Honor.

6           THE COURT:  And if you continued with a not guilty plea,

7  your counsel could try to attack the prosecution's case, and there

8  are different ways in which that can be done.  Sometimes, for

9  example, there are pretrial motions that can successfully keep

10 evidence out of the case.

11          If, for example, you gave a confession to investigators

12 and you had not been given your proper *Miranda* warnings or there

13 were other problems with the way in which the confession was

14 obtained, it could possibly be the case that your confession

15 couldn't be used against you.

16          I don't know what, if any, defenses of that sort you

17 might have, but what you need to understand is that by pleading

18 guilty, you're giving them up.  Do you understand that?

19          THE DEFENDANT:  I do, Your Honor.

20          THE COURT:  And lastly, if you pled not guilty and you

21 went to trial and you were found guilty at trial, you could appeal

22 that finding of guilt to a higher-level court.  Now, do you

23 understand that both under the terms of this plea agreement as

24 well as the way the law is structured, by being found guilty based

25 upon your guilty plea, you give up your right to appeal your

1  conviction?  Do you understand that?

2          THE DEFENDANT:  I do understand that, Your Honor.

3          THE COURT:  Other than the written plea agreement that's

4  in court this afternoon, has anybody promised or suggested to you

5  that by pleading guilty, you would get a lighter sentence or more

6  favorable treatment by the Court?

7          THE DEFENDANT:  No, they have not, Your Honor.

8          THE COURT:  Has anyone put any force or pressure on you

9  to plead guilty today?

10          THE DEFENDANT:  None, Your Honor.

11          THE COURT:  All right.  Mr. Ragland, the last document

12  we need to review is the written statement of facts, which is five

13  pages long, and I see on page 5 again what appears to be your

14  signature and today's date.

15          THE DEFENDANT:  Yes.

16          THE COURT:  Did you, in fact, sign this statement of

17  facts?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  All right.  And before signing the

20  statement, did you very carefully go over it yourself and with

21  your counsel?

22          THE DEFENDANT:  Yes, I did, Your Honor.

23          THE COURT:  Is it completely accurate in every respect?

24          THE DEFENDANT:  Yes.

25          THE COURT:  So as I understand it, you started working

1    at Taylor, Bean & Whitaker Mortgage Corp. in Ocala, Florida, in

2    2002; is that right?

3              THE DEFENDANT:  That's correct.

4              THE COURT:  And that's before this conspiracy began; is

5    that your understanding?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  All right.  And then in 2004, you joined the

8    accounting department; is that correct?

9              THE DEFENDANT:  That's correct.

10             THE COURT:  And later on then you were promoted to

11   becoming senior financial analyst, and you reported to the chief

12   financial officer; is that correct?

13             THE DEFENDANT:  That's correct, Your Honor.

14             THE COURT:  And who was the chief financial officer at

15   that time?

16             THE DEFENDANT:  Delton De'Armas.

17             THE COURT:  All right.  And it says that in 2005, you

18   were assigned responsibilities for reporting and tracking issues

19   related to the Ocala Funding LLC facility.  Is that correct?

20             THE DEFENDANT:  That is correct, Your Honor.

21             THE COURT:  And just so I know, very briefly, what is

22   meant by tracking and -- reporting and tracking issues?

23             THE DEFENDANT:  That would be any of the reporting that

24   was responsible for going out in conjunction with rolling

25   commercial paper or the monthly reports to -- as stated and

1    required in the documents for the facility of Ocala Funding to

2    continue running.

3            THE COURT:  All right.  And it indicates in paragraph 2

4    that from on or about 2006 'til August of 2009, you and the

5    coconspirators began to engage in a scheme to defraud financial

6    institutions that had invested in Ocala Funding.  Do you agree

7    that you started to do that?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  All right.  And that one of the goals of the

10   scheme to defraud was to mislead investors and auditors as to the

11   financial health of Ocala Funding.  Is that correct?

12           THE DEFENDANT:  That's correct, Your Honor.

13           THE COURT:  Had you become aware that there were

14   financial health problems with that funding?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  All right.  Do you agree that nearly

17   1 billion -- that over $1 billion ultimately was misappropriated?

18           THE DEFENDANT:  I don't know the exact figure, but that

19   doesn't surprise me, Your Honor.

20           THE COURT:  All right.  Now, is it correct that the

21   Ocala Funding was managed solely by TBW and had no employees of

22   its own?

23           THE DEFENDANT:  No, it did not have any employees of its

24   own.

25           THE COURT:  All right.  And you were one of the TBW

1  employees responsible for preparing the monthly reports relating

2  to the assets and outstanding liabilities of that entity; is that

3  correct?

4              THE DEFENDANT:  That's correct.

5              THE COURT:  Funding?  All right.

6              And it says in paragraph 4 that as you prepared these

7  reports, you knew and understood that Ocala Funding's assets,

8  including mortgage loans and cash, had to be greater than or equal

9  to its liabilities, which would include outstanding commercial

10 paper held by the financial institutions and a relatively small

11 amount of subordinated debt.  Is that correct?

12             THE DEFENDANT:  That is correct, Your Honor.

13             THE COURT:  All right.  And you understood that from

14 what, your accounting background?

15             THE DEFENDANT:  From my finance background and from,

16 from the documents, like the Exhibit C.  That's what it stated in

17 the actual document itself.

18             THE COURT:  All right.  And it says in paragraph 5 that

19 shortly after Ocala Funding was established, you learned that

20 there was a shortage of assets in that funding, and you began

21 tracking this what's called hole on your own initiative.  Is that

22 correct?

23             THE DEFENDANT:  That is correct, Your Honor.

24             THE COURT:  And I'm curious, why did you do that?

25             THE DEFENDANT:  I was trying to understand what was

1  going on with the facility.  I wanted to understand why it was,

2  why the hole was growing.

3          THE COURT:  All right.

4          THE DEFENDANT:  What was the exact reason why.

5          THE COURT:  And it says that the hole grew significantly

6  over time and by June of 2008 had grown to over $700 million.

7          THE DEFENDANT:  That is correct, Your Honor.

8          THE COURT:  And that's based on your calculations?

9          THE DEFENDANT:  My calculations, Your Honor.

10          THE COURT:  Now, were you advising anybody as to that

11  hole?

12          THE DEFENDANT:  Yes, I was, Your Honor.

13          THE COURT:  And it says in the last sentence of

14  paragraph 5 you kept the CEO and CFO informed, and who are those

15  two people?

16          THE DEFENDANT:  Paul Allen was the CEO, and the CFO was

17  Delton De'Armas.

18          THE COURT:  All right.  And then it says in paragraph 6

19  to cover up the hole at the direction of other coconspirators, you

20  prepared documents that inaccurately and intentionally inflated

21  figures representing the aggregate value of the loans held in that

22  facility or underreported the amount of outstanding commercial

23  paper.  Is that correct?

24          THE DEFENDANT:  That is correct, Your Honor.

25          THE COURT:  Were there specific people who were giving

1    you those directions to do that?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And who were those people?

4              THE DEFENDANT:  The CEO, Paul Allen, and I also spoke

5    about what was going on with the CFO, Delton De'Armas, as well.

6              THE COURT:  All right.  And then you went ahead and sent

7    the false information to the financial institution investors,

8    which included Deutsche Bank and BNP Paribas, as well as to other

9    third parties; is that correct?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  All right.  It says in paragraph 7 at the

12   direction of a coconspirator, you also sent the false reports to

13   an outside audit firm that reviewed financial reports relating to

14   the facility.  Is that correct?

15             THE DEFENDANT:  That is correct.

16             THE COURT:  And who was the outside audit firm?

17             THE DEFENDANT:  James Moore & Company.

18             THE COURT:  All right.  And who was the coconspirator

19   who directed you to do that?

20             THE DEFENDANT:  I'm sorry, say that again, please?

21             THE COURT:  Yeah, who was the coconspirator who directed

22   you to do that?

23             THE DEFENDANT:  Paul Allen, the CEO.

24             THE COURT:  All right.  It says in paragraph 8 that you

25   learned that coconspirators were transferring hundreds of millions

1    of dollars from the Ocala Funding bank accounts, which were

2    located at LaSalle Bank, to TBW accounts, including the TBW

3    operating account, and that those transfers contributed to the

4    hole.  Is that correct?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  And you discovered that yourself?

7              THE DEFENDANT:  Yes, through the tracking process.

8              THE COURT:  All right.  And it indicates here that you

9    did not personally receive any funds from -- that had been

10   misappropriated.  Is that correct?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  All right.  And just so I'm clear, in terms

13   of this overt act, can you give me any more detail?  On May 15,

14   2008, did you send an e-mail from TBW in Ocala to a coconspirator

15   in the Eastern District of Virginia?  Do you remember that

16   incident?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  And did you send the same e-mail

19   to investors and other third parties?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  All right.  And just give me a brief

22   description, what kind of an e-mail was that?

23             THE DEFENDANT:  It was an e-mail with the monthly

24   facility's content summary report.

25             THE COURT:  And so did that, in fact, include the

1   inflated assets?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  All right.  And did you understand that by

4   sending that document, you were sending false information to those

5   entities?

6           THE DEFENDANT:  Yes, I did, Your Honor.

7           THE COURT:  All right.  Now, do you understand,

8   Mr. Ragland, that if the Court accepts your guilty plea today,

9   there'll be no further trial of the issue, and you will be found

10  guilty of this conspiracy?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Do you claim in any respect that you are

13  innocent of the charge?

14          THE DEFENDANT:  No, I do not, Your Honor.

15          THE COURT:  How then do you plead, guilty or not guilty?

16          THE DEFENDANT:  I plead guilty, Your Honor.

17          THE COURT:  All right.  Mr. Sinclair, have you and

18  cocounsel had enough time to fully go over this plea with

19  Mr. Ragland?

20          MR. SINCLAIR:  We have, Your Honor.

21          THE COURT:  Are you both satisfied that the plea is in

22  accord with your understandings of the facts and circumstances?

23          MR. SINCLAIR:  We are, Your Honor.

24          THE COURT:  And that the defendant has entered his plea

25  in a knowing and voluntary fashion?

1        MR. SINCLAIR:  Yes, Your Honor.

2        THE COURT:  All right, Mr. Ragland, based on all these

3   answers to the Court's questions, I am satisfied that you've

4   entered your guilty plea knowingly and voluntarily, that you've

5   had the full advice of counsel in connection with the plea, and

6   that the written statement of facts as well as what you've orally

7   added to that statement in court today is more than enough

8   evidence upon which to find you guilty beyond a reasonable doubt,

9   so the plea is accepted, and you're found guilty.

10       Now, we need to set this case for sentencing, and I've

11   reviewed the Pretrial Services report, and I intend to set the

12   defendant free on a bond, but let's get the date for sentencing

13   first.

14       MR. SINCLAIR:  Do you have June 24 available, Your

15   Honor?

16       THE COURT:  I think that's in the midst of the Judicial

17   Conference this year, Mr. Sinclair, but I'm doing my --

18       MR. SINCLAIR:  We can go down to Greenbrier.

19       THE COURT:  But I will be doing some matters, I have a

20   sentencing already scheduled for Tuesday the 21st.  Would that

21   work on your calendar?

22       MR. SINCLAIR:  We understand the probation officer is

23   jammed, Your Honor, and I think we're asking for extra time in the

24   case.  Is the 21st all right?

25       THE COURT:  Oh, the 21st is going to give them 81 days.

```
 1          MR. SINCLAIR:  Okay.

 2          THE COURT:  And they're going to know about this case.

 3   They've got multiple coconspirators, so they'll have the statement

 4   of facts.

 5          MR. SINCLAIR:  So is it Tuesday morning or afternoon,

 6   Your Honor?

 7          THE COURT:  Tuesday morning.

 8          MR. NATHANSON:  That's fine with the government, Your

 9   Honor.

10          THE COURT:  We can do it at 10:15-10:30?

11          MR. SINCLAIR:  Whatever is the Court's pleasure.

12          THE COURT:  How about 10:15?  Because I have another

13   sentencing set at ten.

14          MR. SINCLAIR:  Your Honor, may I be heard on the terms

15   and conditions of the personal recognizance?

16          THE COURT:  Yes.

17          MR. SINCLAIR:  If Your Honor please, since this was

18   prepared, as Mr. Ragland was about to board the plane last night,

19   he was informed by his current employer that he was losing his job

20   because of this instant offense, and so he really had no other

21   reason to be in San Antonio but for his employment, so he's hoping

22   to try to sell the house or close it up and then come back, and

23   he's planning with his wife and children to live with his father,

24   who is a professor at the University of Georgia, in Athens,

25   Georgia.
```

1          I would therefore ask Your Honor if possible to allow
2    him to travel within the Continental United States.  If you want
3    more specificity, then I would ask for the States of Texas,
4    Florida, where cocounsel is, Georgia, where his family is, Eastern
5    District, where I am and, of course, where the Court is at a
6    minimum, but I just think, Your Honor, if he's going to -- well,
7    I'll address the passport in a second, but I don't think he's in
8    light of his prior record and everything else, he'd be allowed to
9    flee, and I would ask therefore Your Honor just allow him to
10   travel within the Continental United States.
11          THE COURT:  I don't have any problem with travel, but
12   it's got to be pre- -- he has to pre-notify Pretrial.  They have
13   to know where the defendant is.
14          MR. SINCLAIR:  I have no problem with that, Your Honor.
15          THE COURT:  Yeah.
16          MR. SINCLAIR:  As long as he can just call them.  I
17   mean, sometimes, you know, he may be leaving Texas on short notice
18   to go back to Georgia, but I just would have him inform the
19   people, Pretrial of his planned travel.  Is Pretrial for this
20   district going to monitor it, Your Honor, do you know?  Because
21   I'm not sure.  Is Pretrial from this district going to monitor
22   his --
23          THE COURT:  No.  It will be transferred to wherever he's
24   residing.
25          MR. SINCLAIR:  It's Georgia, okay.

1          THE COURT:  Well, right now it's still going to be

2   Texas, because that's where his home is.  I mean, isn't he

3   sleeping every night -- where is his family?

4          MR. SINCLAIR:  He's about to move right now, aren't

5   they?

6          THE DEFENDANT:  As soon as I can.

7          THE COURT:  Well, it would be a brief period of time in

8   Texas, Your Honor, but I believe that as soon as they can get the

9   furniture and household effects packed up or put in storage, they

10  plan on moving back to Georgia.

11         THE COURT:  All right.  Mr. Pet, you're here from

12  Pretrial?

13         MR. PET:  Yes, Your Honor.

14         THE COURT:  All right, I don't want to write all of this

15  out.  You're hearing it in court, and here's how I'll describe it

16  in the -- I'll put a cryptic statement, but your job is to make

17  sure it's communicated to the authorities.  I think the easiest

18  thing is if the defendant's only going to be in Texas a couple of

19  days, we would keep the supervision up here, but it sounds as

20  though it's going to take a couple of weeks to wrap up the house.

21         MR. SINCLAIR:  At least, Your Honor, yes.

22         THE COURT:  So the best thing is to have it

23  transferred down -- would that be the Southern District of Texas?

24         MR. SINCLAIR:  I think it's the Western District, Your

25  Honor.

1          THE COURT:  Do either of you know?

2          MR. SINCLAIR:  Your Honor, a long time ago, I went down

3    there when I was assistant U.S. attorney appointed as a special

4    prosecutor down there for a marijuana case, and I believe San

5    Antonio and Austin were in the Western District, if I'm correct.

6          Am I correct?

7          MR. SCHELLER:  I think so.

8          MR. SINCLAIR:  I'll find out for you, Your Honor, or

9    Mr. Pet, he can find out.

10          THE COURT:  I'm putting in "Western" with a question

11    mark, and Pretrial has the right to correct, to change that, all

12    right?

13          MR. SINCLAIR:  I'm sure the Alamo had to be in the West,

14    Your Honor.  It's got to be the Western District.

15          THE COURT:  Okay.

16          MR. SINCLAIR:  Also, Your Honor, with respect to the

17    passport, as the Court is well aware, when you turn the passport

18    in, it's hard to get the passport back, and cocounsel,

19    Mr. Scheller, is willing to put the passport in his vault.  Would

20    the Court allow that?

21          THE COURT:  Yes.

22          MR. SINCLAIR:  Okay.  Thank you.

23          THE COURT:  All right.  Mr. Ragland, I'm going to

24    release you on the following conditions:  First of all, you must

25    be of uniform good behavior.  That means you cannot violate any

1   federal, state, or local, which would include driving, laws while

2   on supervision.  Do you understand that?

3           THE DEFENDANT:  Yes, Your Honor.

4           THE COURT:  Secondly, you have to comply with all the

5   conditions that will be spelled out in the order setting

6   conditions of release, and they'll also be explained to you by

7   Pretrial.  Do you understand that?

8           THE DEFENDANT:  Yes, I do, Your Honor.

9           THE COURT:  Now, as special conditions, you must

10  reappear in this court on Tuesday, June 21, 2011, at 10:15 for

11  sentencing.  Do you understand that?

12          THE DEFENDANT:  Yes, I do, Your Honor.

13          THE COURT:  I think in all of these cases, we've had a

14  $50,000 unsecured bond.  Is the government requesting that in this

15  case?

16          MR. NATHANSON:  Yes, Your Honor, that's correct.

17          THE COURT:  All right.  And that means, Mr. Ragland,

18  that if you were to fail to appear or otherwise violate any

19  condition of this order, the government would have a judgment

20  against you for $50,000.  Do you understand that?

21          THE DEFENDANT:  I understand that, Your Honor.

22          THE COURT:  You must actively seek employment.  Do you

23  understand that?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  And you will have to advise all future

1    employers or prospective employers of this conviction.  Do you

2    understand that?

3              THE DEFENDANT:  I do, Your Honor.

4              THE COURT:  All right.  You must continue to reside at

5    your current address and not leave the Western, question mark,

6    District of Texas without permission in advance from Pretrial

7    Services.  You may travel anywhere in the United States with

8    permission from Pretrial, and they are to grant that liberally.

9    Do you understand that?

10             THE DEFENDANT:  I do, Your Honor.

11             THE COURT:  You must avoid contact with any witness in

12   this case or persons considered to be alleged victims or potential

13   witnesses unless in presence of counsel.  Do you understand that?

14             THE DEFENDANT:  I do, Your Honor.

15             THE COURT:  You have a right to talk to anybody you want

16   to talk to concerning this case, although I suspect you want to

17   talk to counsel first, but if you want to talk to Mr. Cummings or

18   other counsel for Mr. Farkas or anybody else, you can do so.  You

19   also have a right not to do so.  Do you understand that?

20             THE DEFENDANT:  I do, Your Honor.

21             THE COURT:  All right.  But whatever you do, you need to

22   have counsel present when you do it.  Do you understand that?

23             THE DEFENDANT:  I do, Your Honor.

24             THE COURT:  All right.  You cannot possess a firearm,

25   destructive device, or other dangerous weapon.  Do you understand

1    that?

2              THE DEFENDANT:  I do, Your Honor.

3              THE COURT:  Is there anybody in your household who has

4    firearms?

5              THE DEFENDANT:  No, Your Honor.

6              THE COURT:  All right.  You may not use alcohol to

7    excess or use or possess any illegal drugs.  Do you understand

8    that?

9              THE DEFENDANT:  I do, Your Honor.

10             THE COURT:  You must surrender your passport to counsel

11   immediately.  Do you understand that?

12             THE DEFENDANT:  I do and I have, Your Honor.

13             THE COURT:  All right.  And you may not obtain a

14   passport or other travel documents while on bond.  Do you

15   understand that?

16             THE DEFENDANT:  I do, Your Honor.

17             THE COURT:  Are there any other conditions of release

18   that the government wants the government to impose?

19             MR. NATHANSON:  No, Your Honor.

20             THE COURT:  Mr. Pet, did I leave anything off of the

21   list?

22             MR. PET:  No, Your Honor.

23             THE COURT:  All right, that's fine.

24             Now, Mr. Ragland, when you leave court today -- and

25   Mr. Sinclair knows the drill, but just let me go over it for the

1    record -- you need to check in with the Marshals Service, where

2    you will be processed; you need to go to the Clerk's Office to

3    sign the bond papers; you need to go to the Pretrial Office to

4    talk to Pretrial Services about how they're going to coordinate

5    your supervision; and you also need to check in with the Probation

6    Office.

7                 Do you understand that?

8                 THE DEFENDANT:  Yes, I do, Your Honor.

9                 THE COURT:  All right.  Is there anything further on

10   this case?  No?

11                MR. SINCLAIR:  No, Your Honor.

12                THE COURT:  All right.  Since I have counsel for the

13   government and, Mr. Cummings, I see you here, and you're counsel

14   for Mr. Farkas, I know we have motions tomorrow, but I wanted you

15   both to know so you can take it back to your respective teams,

16   because of the large number of jurors who we're going to have

17   called in on Monday, I'm using Judge Cacheris's courtroom on the

18   10th floor for the jury selection process.

19                Once we have the jury selected, we'll come back and do

20   the trial in this courtroom, but I want to have enough seating so

21   that all the jurors can be seated in the spectator area and there

22   will still be enough room for a certain number of the public, the

23   media, whatever, but I wanted you to know that.  So be prepared on

24   Monday only to report to the 10th floor, not this floor.

25                MR. CUMMINGS:  And do you expect we will stay there all

1    that day, Your Honor?

2              THE COURT:  No.  In other words, opening statements will

3    be done down here.  I'm hoping we'll have the jury seated by

4    lunchtime.  We don't know given the number of jurors coming in,

5    all right?  But I wanted everybody to know that.  And I'll see the

6    rest of you tomorrow morning at 9:00.

7              If there's nothing further, we'll recess court for the

8    day.  Thank you.

9                            (Which were all the proceedings

10                            had at this time.)

11

12                    CERTIFICATE OF THE REPORTER

13        I certify that the foregoing is a correct transcript of the

14   record of proceedings in the above-entitled matter.

15

16

17   _____        /s/
                                         Anneliese J. Thomson
18

19

20

21

22

23

24

25