IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| ) | |
| ) | Case No. 1:11CR162 |
| ) | The Honorable Leonie M. Brinkema |
| ) | Sentencing: June 21, 2011 |
| SEAN WILLIAM RAGLAND ) | |
| ) | |
| Defendant ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

SEAN WILLIAM RAGLAND, by and through his undersigned attorney, respectfully submits his Sentencing Memorandum for this Honorable Court's consideration.

Mr. Ragland requests this Court determine that a variance from the applicable guideline range is appropriate pursuant to 18 U.S.C. § 3553, and thus impose a sentence below the sentence advised by the United States Sentencing Guidelines.

## STATEMENT OF FACTS

1) On March 31, 2011, the government charged Mr. Ragland, by way of information, with a violation of 18 U.S.C. §§ 371. Mr. Ragland pled guilty pursuant to a plea agreement with the government and his sentencing hearing is set for June 21, 2011. The Presentence Report (PSR) in this case calculates Mr. Ragland's total offense level as 35 with a criminal history of I. (PSR at ¶¶ 70, 71). However, based on his conviction under 18 U.S.C. § 371, Mr. Ragland is facing a guideline sentencing range of 60 months pursuant to U.S.S.G. § 5G1.1. (*See id.* at ¶ 72).

2) The government will move this Honorable Court to further reduce Mr. Ragland's sentence to 30 months of incarceration pursuant to USSG § 5K1.1.

3) In determining Mr. Ragland's sentence, it is important to consider his culpability within the context of the culpability of other defendants who have been or will be sentenced in this case as outlined in the chart below.

| Defendant | Charge | Role | Government Recommended Sentence of Incarceration |
|---|---|---|---|
| Lee Bentley Farkas | Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud; and Bank Fraud, Securities Fraud, and Bank Fraud. | 4 levels | Unknown |
| Catherine Kissick | Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud. | 4 levels | 11 years |
| Desiree Brown | Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud. | 3 levels | 96 months (on June 10, 2011, this Court imposed a sentence of 72 months of incarceration) |
| Raymond Bowman | Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud; and False Statements. | n/a | 60 months (on June 10, 2011, this Court imposed a sentence of 30 months of incarceration). |
| Paul Allen | Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud; and False Statements. | 3 levels | Unknown |
| Teresa Kelly | Conspiracy to Commit Bank Fraud, Securities Fraud, and Wire Fraud. | 2 levels | 12 months and one day |

**MEMORANDUM OF LAW**

This Memorandum addresses the question of what is the appropriate sentence for Mr. Ragland based on his violation of the 18 U.S.C. §§ 371. The Memorandum examines the issue of whether a variance is appropriate pursuant to 18 U.S.C. § 3553, notwithstanding the recommendation of the government and the calculation of the sentence determined by the guidelines.

The first section of the memorandum examines the role of a sentencing court in, and the impact of the advisory guidelines, on federal sentencing. This section concludes that recent Supreme Court cases have reaffirmed the discretion and preeminence of the district court in federal sentencing.

The second section of the memorandum analyzes the specific question of what sentence is appropriate for Mr. Ragland based on the statutory factors under 18 U.S.C. § 3553(a). This section concludes that a variance is appropriate in this case.

**I.    The Sentencing Guidelines Cannot Restrict a Court's Discretion**

A district court's discretion is no longer limited by the guidelines since its matrix is now considered merely advisory. *United States v. Booker,* 543 U.S. 220, 245-67, 125 S. Ct. 738, 757-69 (2005). Indeed, it "has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States,* 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) (quoting *Koon v. United States,* 518 U.S. 81, 113, 116 S. Ct. 2035 (1996)).

The use of the Guidelines in other than an advisory function violates the defendant's Sixth Amendment Rights. *Booker,* 543 U.S. at 244-45, 125 S. Ct. at 757-69 (Part Two, Breyer, J.). Moreover, the contention that the Guidelines enjoy a presumption of reasonableness in the District Courts has been rejected.

> *We repeat that the presumption before us is an appellate court presumption.* Given our explanation in *Booker* that appellate "reasonableness" review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review. The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines. [T]he sentencing court] may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines sentence itself fails properly to reflect §3553(a) considerations, or perhaps because the case warrants a different sentence regardless . . . In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.

*Rita v. United States,* 551 U.S. 338, 351, 127 S.Ct. 2456, 2465 (2007) (citations omitted).

A district court now has the ability and authority to impose a sentence, merely "because the case warrants a different sentence ..." regardless of the range determined by a Guideline calculation. *Id*. A sentencing court may impose any sentence it deems appropriate as long as the court properly calculates and considers the Sentencing Guidelines along with the sentencing factors of 18 U.S.C. §3553(a), before reaching its final decision. *Id.*

A sentencing judge's authority to impose sentences substantially lower than those advised by the Sentencing Guidelines has been confirmed. *See Kimbrough v. United States,* 552 U.S. 85, 128 S.Ct. 558 (2007). A sentence that is below the recommended Guideline range does not need to be supported by extraordinary circumstances and the trial judge's sentencing findings should be given great weight. *Gall,* 552 U.S. at 45-48, 128 S. Ct. at 594-595. The Supreme Court has "reject[ed] the use of a rigid mathematical formula that uses the percentage of a

4

departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall,* 552 U.S at 47, 128 S. Ct. at 595. Appellate courts are no longer allowed to substitute their own judgment for that of the trial court in regards to determining the appropriate grounds for an individualized sentence. As long as the record demonstrates the district court considered the factors listed in § 3553(a) and the ultimate sentence is based on a rationale that is supported by the record, the sentence should be upheld on appeal. *Id.* at 51-53, 128 S. Ct at 597-98.

When circuit courts have attempted to substitute their own judgment for that of the trial courts, the Supreme Court has emphasized the power and role of the trial courts. *See e.g., Nelson v. United States,* 555 U.S. 350, 129 S. Ct. 890 (2009) (reversing the Fourth Circuit a second time after it ignored the Supreme Court's prior holding *sub judice* and the holding in *Rita* that the Federal Sentencing Guidelines are not mandatory on sentencing courts, also announcing the Guidelines are not to be presumed reasonable); *Spears v. United States*, 555 U.S. at 261, 129 S. Ct. at 840 (2009) (reversing the Eighth Circuit sitting *en banc* a second time after it ignored the Court's prior holding *sub judice* and the holding in *Kimbrough* that a sentencing court may impose a sentence below that recommended by the Sentencing Guidelines based solely on its view that the guidelines applicable to crack cocaine created an unwarranted disparity within the meaning of the statutory sentencing factors).

Federal trial judges are now not only allowed, but required, to sentence a defendant based on his or her individual characteristics along with those of the defendant's crime. *Gall,* 552 U.S. at 50, 128 S. Ct. at 597. A sentencing court has the power and responsibility to mold an appropriate sentence, defendant by defendant. Thus, this Honorable Court's sentencing decisions, conclusions, and calculus trumps the Sentencing Guidelines and is insulated from

5

second guessing by the appellate courts as long as this Court considers the guidelines *ab initio* and explains the basis for the sentence it imposes. *Kimbrough,* 552 U.S. at 109-10, 128 S. Ct. at 574-75 (*citing Rita,* 551 U.S. at 357-58, 127 S. Ct. at 2469).

## II. The § 3553 factors applied to Mr. Ragland's case.

Congress has identified four "purposes" of sentencing: punishment, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a) (2). To achieve these ends, § 3553(a) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of the specific case through the lens of seven factors, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established . . .;
> (5) any pertinent [Sentencing Commission] policy statement . . .;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

Against this backdrop of factors, a variance from the advisory guidelines is warranted in Mr. Ragland's case.

**1.     The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

      *A.     the nature and circumstances of the offense*

Although Mr. Ragland's crime is serious, the particular circumstances of Mr. Ragland's case establish a series of mitigating factors regarding his criminal conduct. As the PSR demonstrates, Mr. Ragland was among the least culpable, if not the least culpable, in the constellation of criminal defendants in this case.[1] Indeed, this case involved a significant pattern of fraud, orchestrated by Lee Farkas, involving three distinct areas, including the fraud involving: 1) Colonial Bank, 2) Ocala Funding, and 3) Tarp Funding. In this scheme, Mr. Ragland's involvement was primarily limited to Ocala Funding. That is, Mr. Ragland did not have an understanding of or insight into the complete fraud scheme as his role was limited primarily to the Ocala Funding prong of the plot.

Moreover, there are a number of factors establishing that Mr. Ragland's actions were not the result of a nefarious state of mind or corrupt heart. (*See*, *e.g*., Letters from Gerald and Cynthia Ragland included in composite Exhibit A).

Although Mr. Ragland did have a degree in finance, his work at Taylor, Bean & Whitaker (TBW) was his first job after he graduated from college. Consistent with his lack of experience, he began his work for TBW as a "lock-in" agent for mortgage loans. He was quickly promoted to a position of senior financial analyst, not because his experience and training justified such a position, but rather because it put him in a role where he was vulnerable to the directions of others such as Lee Farkas, Paul Allen (the CEO of the company), and Delton de Armas (the CFO of TBW).

---

[1] The proposition that Mr. Ragland is the least culpable in the constellation of defendants is underscored by the respective charges that each defendant pled to, as well as their associated guideline ranges.

Initially, Mr. Ragland relied on the assurances of these individuals that the accounting methods of the company were legitimate and that the company as a whole had sufficient funds to operate, notwithstanding the significant debt or hole that the company was accumulating. Regarding this hole, Mr. Ragland, on his own initiative, began to track the hole at TBW in an effort to inform and convince his superiors regarding the failing position of TBW. At first, Mr., Ragland naively accepted their assurances regarding the financial health of the company. He did come to realize, however, that said assurances were incorrect and the company was defrauding its investors and various financial institutions. The gravamen of Mr. Ragland's conduct was that he followed his superiors' directions to perpetuate the fraud by executing financial documents that misled the investors regarding the financial state of TBW and Ocala Funding.

In assessing the culpability of Mr. Ragland, it is important to appreciate that he, unlike certain co-defendants, did not commit his acts for any financial gain nor was he overcompensated for the work he performed. Thus, this Court is necessarily confronted, in assessing his sentence, with the question of why Mr. Ragland engaged in his illegal conduct. In answering this question, it is important to comprehend that a series of factors made Mr. Ragland uniquely vulnerable to the commands of his superiors. As previously noted, Mr. Ragland was promoted quickly to positions that were beyond his training or experience.

Furthermore, Mr. Ragland's personality made him uniquely susceptible to the commands of his superiors. In this regard, Mr. Ragland suffers from a dependent personality disorder. (*See* Report of Dr. Jeffrey Siegel, attached as composite Exhibit B). The impact of Mr. Ragland's dependent personality disorder on his submissive conduct cannot be understated. As defined:

> Dependent personalities are distinguished from other pathological patterns by their marked need for social approval and affection, and by their willingness to live in accord with the desires of others. Dependent persons' "centers of gravity"

lie in others, not in themselves. They adapt their behavior to please those upon whom they depend, and their search for love leads them to deny thoughts and feelings that may arouse the displeasure of others. They avoid asserting themselves lest their actions be seen as aggressive. Dependents may feel paralyzed when alone and need repeated assurances that they will not be abandoned. Exceedingly sensitive to disapproval, they may experience criticism as devastating.

Dependent personalities tend to denigrate themselves and their accomplishments. What self-esteem they possess is determined largely by the support and encouragement of others. Unable to draw upon themselves as a major source of comfort and gratification, they must arrange their lives to ensure a constant supply of nurturance and reinforcement from their environment. However, by turning exclusively to external sources for sustenance, dependents leave themselves open to the whims and moods of others. Losing the affection and protection of those upon whom they depend leads them to feel exposed to the void of self-determination. To protect themselves, dependents quickly submit and comply with what others wish, or make themselves so pleasing that no one could possibly want to abandon them.

Dependents are notably self-effacing, obsequious, ever-agreeable, docile, and ingratiating. A clinging helplessness and a search for support and reassurance characterize them. They tend to be self-depreciating, feel inferior to others, and avoid displaying initiative and self-determination. Except for needing signs of belonging and acceptance, they refrain from making demands on others. They deny their individuality, subordinate their desires, and hide what vestiges they possess as identities apart from others. They often submit to abuse and intimidation in the hope of avoiding isolation,

Theodore Millon, *Disorders of Personality, DSM-3, Axis 2*: *Ch. 4 Dependent Personality: The Submissive Pattern* (1996).[2]

---

[2] The DSM IV, a widely used manual for diagnosing mental disorders, defines dependant personality disorder as meeting at least five of the following factors, including:

1. has difficulty making everyday decisions without an excessive amount of advice and reassurance from others
2. needs others to assume responsibility for most major areas of his or her life
3. has difficulty expressing disagreement with others because of fear of loss of support or approval. Note: do not include realistic fears of retribution.
4. has difficulty initiating projects or doing things on his or her own (because of a lack of self-confidence in judgment or abilities rather than a lack of motivation or energy)

Dr. Siegel's testing revealed that Mr. Ragland had a dependent personality and feared abandonment by significant persons in his life.[3] He was overly sensitive to criticism and responded by willingly complying with the needs and requests of others. (Ex. B). Such personality traits made Mr. Ragland uniquely vulnerable to the manipulations of his superiors at TBW. *See id.* Indeed, the evidence indicates that Mr. Ragland succumbed to the pressures put forth by his superiors, notwithstanding his misgivings about his conduct. *Id*.

As noted in foregoing, Mr. Ragland's criminal conduct was not the result of nefarious intent, but the rather the product of personal weakness. Indeed, Mr. Ragland's dependent personality, with its associated characteristics of obsequiousness and docility, made him uniquely vulnerable and susceptible to the directions of his superiors in the dark wood[4] of TBW. It is also important to consider that at the time he committed part of this offense, his susceptibility to the influence of others was heightened due to the fact that he was under extreme stress as the result of the premature birth of his son. In essence, a number of factors in this case created a perfect storm which impacted Mr. Ragland's conduct. In the end, the interplay between these factors does not demonstrate a defendant motivated by personal gain or an evil *mens rea*.

---

5. goes to excessive lengths to obtain nurturance and support from others, to the point of volunteering to do things that are unpleasant
6. feels uncomfortable or helpless when alone because of exaggerated fears of being unable to care for himself or herself
7. urgently seeks another relationship as a source of care and support when a close relationship ends
8. is unrealistically preoccupied with fears of being left to take care of himself or herself

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders 4*[th] *ed.*, *Dependent Personality Disorder* (2000).

[3] The testimony of Mr. Ragland's family and friends is consistent with Dr. Siegel's findings. *See* Ex. A.

[4] *See* Dante Aligheni, La Divina Commedia, Inferno, Canto I, (1472) (Midway through this Life we are borne upon; I found myself in a dark wood, Where the way of truth was wholly lost and gone).

Finally, Mr. Ragland demonstrated his sense of remorse and acceptance of responsibility by cooperating with the federal government and truthfully disclosing the extent of his activity.

B.    *the history and characteristics of the defendant*

As previously noted, Mr. Ragland's is an individual who suffers from dependent personality disorder – a condition that contributed to his commission of the offense. The fact that he suffers from such a disorder should not detract from the outstanding person he has proven to be in his life. Indeed, the PSR demonstrates an individual with a stable and long-standing employment history. (PSR at ¶¶ 56-58; *see also* Letter of Don Shilling included in Ex. A). Furthermore, the quality of Mr. Ragland's character is demonstrated by his significant family and community support. *See* Ex. A. The letters submitted on behalf of Mr. Ragland establish that he embodies the best of human qualities including generosity, compassion, hard-work, and commitment. Mr. Ragland is a loving and committed father to both his wife, Marlo, and his three-year old son, Kieren. *See id*.  Regarding his family, Mr. Ragland's love for his immediate family is profound and he has been the primary means of their financial support.[5] The letters describe a man who is an extremely loving and dedicated father, son, sibling and friend, who treats those around him with respect and equality. His generous nature is underscored by his charitable work for the March of Dimes and with animal care.   (*See id*.).

In summary, Mr. Ragland's background reflects that at the time he committed the

---

[5] Courts have long-recognized that departures under the applicable guideline range are warranted based on the impact incarceration will have on innocent family members. *See, e.g.*, *U.S. v. Galante*, 111 F.3d 1029 (2d Cir.1997) (affirming downward departure in drug case from 46-57 months to 8 days – where D showed he was a conscientious and caring father of two sons who would have faced severe financial hardships ); *United States v. Milikowsky*, 65 F.3d 4, 8 (2d Cir. 1995)("Among the permissible justifications for downward departure ... is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties.")  *See also* U.S.S.G. § 5H1.6.

11

offense, he was an individual who was not motivated by an evil state of mind. Indeed, his character establishes the opposite conclusion. Rather, he was an individual whose motivations, which included the need to support his family and co-workers, were also impacted by certain and palpable limitations in his mental constitution.

**2. The Need for the Sentence Imposed**

> *A.   to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct;*

As a result if this offense, Mr. Ragland is a convicted felon who has suffered public humiliation, has lost his career in the financial industry, and will likely lose his home. In addition, he will have significant restitution obligations.

The argument that general deterrence should result in a period of imprisonment for Mr. Ragland is belied by two important aspects of his case. First, placing general deterrence as the primary consideration in this matter contradicts the tenet established in *Koon*, 518 U.S. at 81, 113, 116 S. Ct. at 2035, that a sentencing court "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Despite the government's own unique and proposed graduated sentencing scheme for all co-defendants in this case, the fact of the matter is that Mr. Ragland is the least culpable of the defendants and thus he should receive the least punitive sentence under any principled system of justice, notwithstanding the government's recommendation.

Moreover, the notion that that the most culpable defendants in this case will or have received significant terms of incarceration accomplishes the goal of general deterrence.

    B.    *to protect the public from further crimes of the defendant;*

The need to protect the public from future crimes by Mr. Ragland is not an issue since he poses a low risk of recidivism. In particular, Mr. Ragland poses a low risk of recidivism based his education, family support, and employment history. (*See, e.g.*, USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 12 (May 2004), excerpt hereto attached as Exhibit C).

    C.    *to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;*

Mr. Ragland respectfully submits that this factor is not applicable in his case since he has his college education. Moreover, he does not have a drug or alcohol problem. Finally, his mental condition can be effectively treated on an out-patient basis.

**3.    The Kinds of Sentences Available**

Because a mandatory minimum sentence does not apply to Mr. Ragland's case, this Court is not bound by statute to impose a term of incarceration. Moreover, as noted in Section I, *supra*, the guideline sentence is merely advisory, not mandatory.

**4-5.    The Kinds of Sentence and the Guideline Sentencing Range Established and any Pertinent Sentencing Commission Policy Statements**

The impact of the guidelines on a court's sentencing discretion has been discussed in Section I, *supra.* As recognized in *Gall*, however, district courts "may not presume that the Guidelines range is reasonable." 552 U.S. at 49, 128 S.Ct. at 597. *See also Rita*, 551 U.S. at 351, 127 S.Ct. at 2465("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). Thus, mitigating circumstances and substantive policy arguments that were formerly irrelevant in all but the most unusual cases are now potentially

relevant in every case.

Accordingly, this Court should take into account a number of factors in determining Mr. Ragland's sentence including the contribution of his personality disorder to his commission of the offense, as well as his relative lack of culpability when compared to the roles of his co-defendants. Furthermore, this Court may consider the impact incarceration would have on Mr. Ragland's family. Although these factors are ignored in the advisory guideline range, they establish that a variance is warranted in Mr. Ragland's case.

**6. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct**

The issue of disparity is of significant import in Mr. Ragland's case. As previously noted, Mr. Ragland was the least culpable among his co-defendants. The fact that the government has sought a sentence of approximately one-year for Teresa Kelly, an individual who had a greater role in the scheme, is antagonistic to the idea that like defendants should be treated similarly and is also hostile to our system of justice. Indeed, a central purpose of the federal guideline system was to eliminate disparity between like defendants convicted of the same crime. *See, e.g.*, *United States v. Caperna*, 251 F.3d 827 (9th Cir. 2001); *United States v. Daas*, 198 F.3d 1167 (9th Cir. 1999). *See Koon,* 518 U.S. at 113, 116 S.Ct. 2035 ("The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach towards the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice."). Accordingly, he should, at a minimum, receive a sentence of incarceration that is equivalent to Ms. Kelly.

**7. The Need to Provide Restitution to Any Victims of the Offense.**

Although the amount of restitution has not been determined in this case, it will be significant. Accordingly, a sentence of probation, with the special condition of home detention if

necessary, will allow Mr. Ragland to pay his restitution while continuing to support his family.

## CONCLUSION

The circumstances presented in Mr. Ragland's case justify a variance from the sentence recommended by the United States. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Mr. Ragland respectfully submits that a sentence similar to the one imposed on Teresa Kelly is appropriate in his case.

Respectfully Submitted:

_____/s/_____
J. Frederick Sinclair, Esq.
Virginia State Bar #08073
Attorney for Sean William Ragland
J. Frederick Sinclair, P.C.
100 North Pitt Street, Suite 200
Alexandria, Virginia  22314
Tel. No. 703-299-0600
Facsimile No. 703-299-0603
jfredsinclair@yahoo.com


Fritz Scheller
Florida Bar No. 183113
Fritz Scheller P.L.
1211 Orange Avenue, Suite 103
Winter Park, Florida 32789
PH:    (407) 792-1285
FAX:   (407) 513-4146
Attorney for Sean Ragland

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of June, 2011, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Charles Connolly
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Charles.Connolly@usdoj.gov

                                                               /s
                                        J. Frederick Sinclair, Esq.
                                        Virginia State Bar #08073
                                        Attorney for Sean William Ragland
                                        J. Frederick Sinclair, P.C.
                                        100 North Pitt Street, Suite 200
                                        Alexandria, Virginia 22314
                                        Tel. No. 703-299-0600
                                        Facsimile No. 703-299-0603
                                        jfredsinclair@yahoo.com