IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:11CR162 |
| v. ) | |
| ) | Honorable Leonie M. Brinkema |
| SEAN RAGLAND, ) | |
| ) | Sentencing Date: June 21, 2011 |
| Defendant. ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Denis J. McInerney, Chief, Fraud Section of the Criminal Division of the United States Department of Justice, Patrick F. Stokes, Deputy Chief, and Robert A. Zink, Trial Attorney, and Neil H. MacBride, United States Attorney for the Eastern District of Virginia, Charles F. Connolly and Paul J. Nathanson, Assistant United States Attorneys, in accord with 18 U.S.C. § 3553(a) and the United States Sentencing Commission, Guidelines Manual ("Guidelines" or "U.S.S.G.") § 6A1.2 (Nov. 2010), files this Position of the United States With Respect to Sentencing of the defendant, Sean Ragland. For the reasons discussed herein, the Government requests that the Court assess a sentence of 5 years and reduce that sentence by 50% based on Ragland's substantial assistance to the Government's investigation, for a final sentence of two-and-a-half years' (30 months') incarceration in this case.[1]

---

[1] The Government recognizes that this Court imposed sentences on Desiree Brown and Ray Bowman that were less than the sentences recommended by the Government. Nevertheless, the Government's sentencing recommendation here is consistent with the position the Government

*Background*[2]

Lee Farkas was the chairman and principal owner of Taylor, Bean & Whitaker Mortgage Corp. ("TBW"), a mortgage company based in Ocala Florida. Colonial Bank was one of the 25 largest depository banks in the country and was based in Montgomery, Alabama. Colonial's Mortgage Warehouse Lending Division ("MWLD") provided financing to mortgage origination companies, including TBW. From approximately 2002 through August 2009, Farkas and numerous co-conspirators, including Sean Ragland, defrauded three banks of more than $2.9 billion, misled shareholders of Colonial BancGroup, Inc., and attempted to fraudulently obtain more than $500 million from the government's TARP program.

The conspiracy consisted of five separate schemes:

1. **Overdraft / sweeping scheme:** Beginning in 2002, Farkas and other co-conspirators engaged in a "sweeping" scheme to hide overdrafts in TBW bank accounts held at Colonial Bank. TBW ran large overdrafts in its Master Account to cover its operating expenses. To cover up the overdrafts, conspirators "swept" funds on a daily basis into this account from the Investor Funding Account, a Colonial Bank-controlled account. The sweeping scheme, which grew to approximately $140 million, continued until approximately December 2003. In addition to Farkas, other co-conspirators participating in the sweeping scheme included Ray Bowman, the president of TBW, Cathie Kissick, head of the MWLD at Colonial Bank, and Teresa Kelly, an MWLD operations supervisor.

---

informed the Court it would take with respect to each cooperating co-conspirator. The Government is following its initial recommendations to provide the Court with a consistent benchmark from which to compare the relative culpability and cooperation of each respective cooperating defendant.

[2] In light of this Court's familiarity with the facts of this case, the Government includes only a brief overview and recitation of the key facts.

2. **Plan B on COLB.** In December 2003, Farkas and Kissick implemented "Plan B," a new phase of the scheme in which they caused the deficit covered up by the sweeping scheme to be moved to the COLB facility. While Plan B was initially supposed to be a one-time event, the conspirators continued to engage in Plan B transactions for years. Under Plan B, conspirators caused TBW to engage in fake sales of mortgage assets to Colonial Bank. TBW pretended to sell mortgage loans to Colonial Bank, and the bank advanced TBW money for the loans. In fact, the mortgage loans either did not exist or had already been sold to other banks or investors. By mid-2005, Colonial Bank held approximately $250 million in Plan B loans on its books. In addition to Farkas and Kissick, Bowman, Kelly, and Desiree Brown, TBW's Treasurer, participated in Plan B.

3. **Plan B on AOT.** Plan B on COLB grew to approximately $250 million and, because of the number of loans involved, became difficult for the conspirators to administer. In 2005 the conspirators moved Plan B from COLB to Colonial's Assignment of Trade (AOT) facility. The AOT facility was intended for the purchase of pools of loans that TBW was in the process of selling or securitizing. Under this new version of Plan B, the conspirators engaged in fake sales of pools of loans to Colonial Bank, and in return TBW received over $1.3 billion from Colonial Bank from mid-2005 through mid-2008. The Plan B pools of loans that TBW sold Colonial Bank consisted of nothing more than data for pools of loans that TBW had already sold to other investors. As such, the Plan B data were worthless to Colonial Bank. TBW paid down some of the Plan B balance on AOT over time, and by August 2009 Colonial Bank held approximately $500 million worth of worthless Plan B pools on the AOT facility. Farkas, Kissick, Brown, and Kelly were involved with Plan B on AOT. As a result of Plan B, Colonial BancGroup, the public holding company for the bank, significantly overstated the mortgage assets held by the

MWLD in BancGroup's public financial filings, including its annual reports (Forms 10-K) and quarterly reports (Forms 10-Q).

    4. **Ocala Funding ("OF").** OF was a standalone subsidiary of TBW. It was designed to provide low-cost funding to TBW for additional mortgage loan originations. It was also set up to be bankruptcy remote. OF issued commercial paper (corporate IOUs) to investors in return for cash. OF would then use the cash to fund mortgage loans at TBW. OF was required to have at all times more assets (cash + loans) than liabilities (the commercial paper). And, OF cash could only be used for OF purposes. When TBW ceased operations in August 2009, there were two investors in OF: Deutsche Bank ("DB") and BNP Paribas, who owned a combined $1.75 billion in commercial paper. Farkas and Brown caused nearly all of the assets in OF to be stripped out and used to pay other TBW expenses, including mandatory servicing advances to investors in mortgage bonds TBW had sold. To cover up the missing assets, co-conspirators caused OF loans already sold to Freddie Mac to continue to appear as collateral at Colonial Bank and OF. As a result, Colonial Bank believed it owned $900 million in loans that had already been sold to Freddie Mac, and DB and BNP Paribas, as the investors in OF, believed they had approximately $1.67 billion in loan collateral backing their supposedly asset-backed commercial paper when in fact there was only collateral of roughly $160 million. Ragland and Paul Allen, TBW's CEO, facilitated the conspiracy by causing false collateral reports to be sent to DB and BNP Paribas as well as the custodian for OF, LaSalle Bank (purchased by Bank of America in 2007), that inflated by hundreds of millions of dollars the actual value of the collateral backing the commercial paper. Kissick and Kelly were not involved in the OF phase of the fraud scheme, and Colonial Bank was a victim of this fraud.

5.  **Capital Raise.**  In the fall of 2008, Colonial BancGroup, Colonial Bank's holding company, applied for more than $550 million of TARP funds.  Colonial BancGroup was approved for $553 million contingent upon its raising an additional $300 million in private capital.  In early 2009, TBW undertook to lead the capital raise.  TBW said it would invest $150 million itself and would find two private equity investors to invest $50 million each.  Colonial BancGroup undertook to raise the remaining $50 million from other companies with which it did business.  Ultimately, Colonial BancGroup announced on March 31, 2009, that it had met its contingency.  That was false; TBW had falsely represented the participation of the two $50 million private equity investors and misrepresented where the 10% deposit for TBW itself had come from.  Moreover, Colonial BancGroup's TARP application, which incorporated the bank's financial statements, was materially false in that the fraud scheme caused the bank to significantly overstate the value of mortgage assets on its books.  Farkas and Allen were involved in falsely representing the participation of the two $50 million private equity investors.  Brown assisted Farkas in obtaining a $25 million deposit on behalf of TBW and the two equity investors by taking the money from OF.  While Kissick was not aware of Farkas's misrepresentations regarding the equity investors, she knew that Colonial BancGroup's TARP application relied upon false bank financial data.  Ragland and Kelly were not involved in the Capital Raise portion of the fraud scheme.

*The Appropriate Guidelines Range*

The Probation Officer has calculated Ragland's offense level to be 35.  Specifically, the Probation Officer includes a base offense level of 6, a 30-level enhancement for a loss of more than $400 million, a 2-level enhancement for sophisticated means, and a 3-level reduction for acceptance of responsibility.  Ragland stipulated to these enhancements in his plea agreement.

This results in a Guidelines range of 168-210 months.  As Ragland pleaded guilty to a one-count information charging him with conspiracy under 18 U.S.C. § 371, his maximum possible period of incarceration is 5 years.

*Application of the Guidelines*

**I.     Applicable Legal Standards**

As this Court is aware, following the Supreme Court's decision in *United States v. Booker*, the Guidelines are now advisory.  *United States v. Booker*, 543 U.S. 220, 261 (2005).  As such, "[i]n the wake of *Booker* . . . the discretion of the sentencing court is no longer bound by the range prescribed by the guidelines."  *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  The Supreme Court subsequently clarified that this means that the sentencing court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007), *quoted in Nelson v. United States*, 129 S.Ct. 890, 892 (2009).  Nevertheless, "sentencing courts are not left with unguided and unbounded sentencing discretion."  *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006).   Instead, at sentencing a court "must first calculate the Guidelines range."  *United States v. Nelson,* 129 S. Ct. at 891; *see also United States v. Hughes*, 401 F.3d at 546 (holding that a sentencing court is still required to 'consult [the] Guidelines and take them into account when sentencing'") (*quoting United States v. Booker*, 542 U.S. at 264).  After appropriately calculating the Guidelines, a sentencing court must then consider the Guidelines range, as well as the sentencing factors set forth in 18 U.S.C. § 3553(a), and determine a sentence that is appropriate for the individual defendant.  *United States v. Nelson,* 129 S. Ct. at 891-92, *see also United States v. Hughes,* 401 F.3d at 546.

**II.    Sentencing Recommendations**

Ragland played a significant role in the Ocala Funding fraud.  He administered the day-

to-day activities of the Ocala Funding scheme and was fully aware that his actions were fraudulent.

Specifically, Ragland monitored the loan and cash collateral in Ocala Funding on a daily basis and quickly learned of the collateral shortfall in the facility. He had frequent conversations with his superiors about the deficit in Ocala Funding and eventually documented and tracked the deficit as it grew over time. Ragland became responsible for sending out fraudulent reports to third-parties and investors that covered up the deficit in Ocala Funding. The reports to investors had the effect of giving investors a false sense of confidence in the financial solvency of the facility and facilitated further investment in the facility. During the Ocala Funding fraud, Ragland rose from the position of financial analyst, to senior financial analyst, to director of finance.

Additionally, on at least one occasion, Ragland assisted others in the accounting department at TBW to falsify TBW's annual financial statements. This was done to create the appearance that TBW was a healthy company when, in fact, the company was operating a deficit.

But Ragland's role in the conspiracy was more limited than some of the other co-conspirators. He was not actively involved in, nor did he have knowledge of, sweeping or Plan B on COLB or AOT. And he had no role in the Capital Raise fraud. Ragland also occupied a relatively junior position at TBW in contrast to the other TBW defendants (Farkas, Allen, Bowman, and Brown). Ragland was not an architect of the Ocala Funding fraud. Rather, he took direction from Allen, among other executives, on how to carry out this aspect of the fraud scheme. Further, Ragland raised concerns over a period of years to supervisors about the deficit in Ocala Funding on a relatively consistent basis. For these reasons, among others, the

Government agreed to a single criminal charge that established a five-year statutory maximum period of incarceration. The Guidelines call for imposition of that statutory maximum. This is appropriate given the fact that Ragland personally created and distributed fraudulent Ocala Funding reports to third-parties and investors over a multi-year period, and also assisted in falsifying TBW's annual financial statements. Based on these criminal acts, along with the staggering loss suffered by investors in Ocala Funding, the Government asks this Court to impose the statutory maximum as an initial sentence before reducing it pursuant to the Government's substantial assistance motion.

### III.    The 18 U.S.C. § 3553(a) Factors

In imposing a sentence in this case, the Court must look to 18 U.S.C. § 3553(a). This section requires that the Court consider, among other things, (a) the nature and circumstance of the offense and the history and characteristics of Defendants; and (b) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a). As noted above, the government believes the § 3553(a) factors warrant an initial sentence of five years before the Court applies a reduction for substantial assistance.

  A.    *Nature and Circumstances of the Offense and History and Characteristics of the Defendant.*

One key factor that the Court must consider is the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). Ragland participated in a massive fraud scheme, both with respect to duration and loss. From the creation of Ocala Funding in early 2005 to its eventual dissolution in mid-2009, Ragland managed the facility on a day-to-day basis and routinely falsified key reports to cover up the deficit in the facility and mislead investors and third-parties. Ragland knew that if the deficit in

Ocala Funding was discovered, Ocala Funding would fail and likely cause TBW to fail, which would cause Ragland and others at TBW to lose their jobs.

On the other hand, Ragland repeatedly voiced concerns about the solvency of Ocala Funding to supervisors, including Allen. Allen and others instructed Ragland to continue the fraud, providing specific direction on the mechanics of the scheme while also allaying Ragland's concerns. As a senior financial analyst and eventual director of finance at TBW, Ragland eventually came to earn a salary of approximately $100,000 per year. The evidence shows that Ragland – unlike Farkas – did not receive direct compensation from, or for his involvement in, the Ocala Funding fraud scheme.

Ragland's role in one of the largest fraud schemes in recent history warrants a substantial sentence, and the Government believes that imposing an initial sentence at the statutory maximum of five years, before applying a reduction for substantial assistance, appropriately reflects the nature and circumstances of the crime and his history and characteristics.

    **B.** *Seriousness of the Offense, Respect for the Law, Just Punishment for the Offense, and Deterrence to Criminal Conduct*

The Court must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2). Fraud cases are serious offenses, and those who commit such offenses deserve particularly severe sentences because the nature and complexity of the fraud they commit requires such significant time and resources to detect, prosecute, and deter. A five-year initial sentence would appropriately reflect the seriousness of the offense and provide just punishment in this case.

Imposing an initial sentence of five years would also afford both specific and general deterrence, as required by 18 U.S.C. § 3553(a)(2)(B). Ragland knowingly and intentionally

facilitated a massive fraud scheme for more than four years. While Ragland's cooperation with the Government's investigation suggests that he has fully accepted responsibility for his actions, his lengthy participation in the scheme warrants a sentence that will impress upon him that such conduct will not be treated lightly or tolerated. An initial sentence of five years will make clear to Ragland the seriousness of his conduct and its consequences.

Imposing an initial sentence of five years also will promote general deterrence. Despite Ragland's comparatively low-ranking position in the Ocala Funding fraud scheme, he was a necessary and critical participant in a staggering fraud. General deterrence alone can justify lengthy sentences, even where such long sentences are not necessary to achieve specific deterrence. *United States v. Sagendorf*, 445 F.3d 515, 518 (1st Cir. 2006). A five-year initial sentence would provide notice that corporate employees who mislead the public and investors, even those who act at the direction of company executives, face significant prison time for their criminal conduct. This is especially true when the criminal conduct spans a period of years and results in out-of-pocket losses as large as they are in this case. Here, where Ragland was a key player in a massive fraud scheme over a series of years, a sentence that includes a significant period of incarceration is necessary to send a strong deterrence message to others.

If the sentence truly is to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment for the offense," and "afford adequate deterrence to criminal conduct," it must be substantial. *See* 18 U.S.C. § 3553(a)(2). This is particularly true here in light of the size of the fraud scheme, its duration, and the substantial damage it caused. An insubstantial sentence would signal that the type of long-standing, egregious fraud in which the defendant engaged is somehow deserving of special consideration from the Court. Moreover, if individuals who defraud investors believe that the penalty for doing so is trivial, then no

disincentive exists to prevent those who are best-equipped with the means and ability to commit fraud from doing so. An initial sentence of five years, before applying a reduction for substantial assistance, is necessary to satisfy the requirements of § 3553(a)(2).

### C. *The Need to Avoid Unwarranted Sentencing Disparities*

The Government's recommendation that the Court impose an initial sentence of five years for Ragland does not take into account sentences already imposed for Brown and Bowman. The Government has not modified its recommendation principally because all of its sentencing recommendations – for all cooperating defendants – were carefully considered relative to one another before any sentences were imposed. In so doing, the Government endeavored to provide the Court with insight into how the Government views the relative culpability (and cooperation) of each defendant. The Government fully expects that the Court will impose Ragland's sentence in a manner consistent with its sentences for both Brown and Bowman, and in a way that will avoid any unwarranted sentencing disparities between Ragland and the other co-defendants who pleaded guilty and testified against Farkas.[3]

The Government submits that it is appropriate for Ragland to face a shorter initial period of incarceration than Bowman, Allen, Brown, and Kissick. This primarily is because Ragland: (1) had a limited role in the overall conspiracy (i.e., Ragland was not a participant in Plan B on COLB or AOT, nor was he a participant in the Capital Raise scheme); (2) held the lowest position in the Ocala Funding fraud of any of the cooperating defendants; (3) was compensated

---

[3] The Government has included a chart in its under-seal motion for a reduction in sentence that contains the same sentencing recommendations it included in earlier under seal filings for other defendants. In addition, the Government has a more fulsome explanation of the comparative culpabilities of the six cooperators in the sentencing position it filed with respect to Desiree Brown.

(salary) less than Allen, Bowman, Brown, or Kissick; and (4) voiced concerns to supervisors throughout the Ocala Funding fraud about the propriety of his and other co-conspirators' actions. Also, the Government notes that for those of the cooperating defendants facing a maximum period of incarceration of less than 30 years, like Ragland, Allen, Bowman, and Kelly, the Government has recommended an initial period of incarceration equal to the statutory maximum sentence (prior to any reduction for substantial assistance).

The Government intends to recommend a substantially higher sentence for Farkas. Farkas led the fraud scheme, in part, by manipulating his co-defendants and limiting the flow of information to them. He was the overwhelming beneficiary of the scheme, he stood to gain the most as the owner of TBW, and he lived a lavish lifestyle that none of his co-conspirators shared. Ragland and his cooperating co-defendants' cases also are in a very different posture than Farkas's. They each pleaded guilty pre-indictment, fully accepted responsibility, have shown remorse for their actions, and cooperated substantially with the Government's investigation. Thus, for Ragland, an initial sentence of five years would not, the Government respectfully submits, create an unwarranted disparity with a much lengthier sentence imposed on Farkas.

*Restitution*

The Government is still in the process of identifying victims and their loss amounts. The amount of potential restitution in this case is enormous, with some defendants potentially facing restitution orders of up to $2.9 billion. While it is unlikely that the victims will recover the full amount from the defendants, the Government needs additional time to identify victims and the amounts they are owed to ensure they are able to recover ratably from any restitution payments made by Ragland (or the other defendants). Therefore, after consultation with defense counsel and pursuant to 18 U.S.C. § 3664(d)(5), the Government respectfully moves the Court to defer

the entry of the restitution order until after the Farkas sentencing. In particular, the Government requests a date approximately one week after the Farkas sentencing to submit to the Court a proposed restitution order for Ragland (as well as all other defendants) that reflects all of the victims identified to date. This will ensure that late-identified victims and changes to loss figures based on additional review are consistently reflected in each restitution order.

## *Conclusion*

In accordance with the foregoing and for the reasons stated herein, and to the extent consistent with sentences already imposed, the United States respectfully requests that the Court impose an initial sentence of 5 years' incarceration and then, for the reasons set forth in the Government's substantial assistance motion, reduce that sentence by 50% for a final sentence of two-and-a-half years' (30 months') incarceration.

        Respectfully submitted,

        Neil H. MacBride
        United States Attorney

By:     _____/s/_____
        Charles F. Connolly
        Paul J. Nathanson
        Assistant United States Attorneys
        Eastern District of Virginia
        U.S. Attorney's Office
        2100 Jamieson Avenue
        Alexandria, VA 22314
        Ph: 703.299.3700
        Fax: 703.299.3981
        Charles.Connolly@usdoj.gov


        Denis J. McInerney
        United States Department of Justice
        Chief, Criminal Division, Fraud Section

By:     _____/s/_____
        Patrick F. Stokes
         Deputy Chief
        Robert A. Zink
         Trial Attorney
        U.S. Department of Justice
        1400 New York Avenue, NW
        Washington, DC 20005
        Ph: 202.305.4232
        Fax: 202.514.7021
        Patrick.stokes2@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of June, 2011, I filed electronically the foregoing Position of the United States with Respect to Sentencing using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record in the above-captioned case.

I have also sent a copy of the filing to the following:

    Karen Moran
    Senior U.S. Probation Officer
    Karen_Moran@vaep.uscourts.gov

                                                                               /s/
                                        Paul J. Nathanson
                                        Assistant United States Attorney
                                        U.S. Attorney's Office
                                        2100 Jamieson Avenue
                                        Alexandria, VA 22314
                                        Phone:  (703) 299-3700
                                        Fax:  (703) 299-3981
                                        Email:  Paul.Nathanson@usdoj.gov